UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
STEVEN M. HARRISON, JAMES KOMAS,
WILLIAM J. MORGAN, HARRISON & MAURO
PARTNERS,

              Plaintiffs,

   -against-

BARRY RUBENSTEIN, WHEATLEY PARTNERS II,
L.P., WHEATLEY PARTNERS, L.P., WHEATLEY
FOREIGN PARTNERS L.P., WOODLAND VENTURE
FUND, SENECA VENTURES, BROOKWOOD
PARTNERS, L.P., WOODLAND PARTNERS,
WOODLAND SERVICES CORP., APPLEWOOD
CAPITAL CORP., REV-WOOD (PARTNERSHIP),
THE MARILYN AND BARRY RUBENSTEIN
FAMILY FOUNDATION, BRIAN RUBENSTEIN,
REBECCA RUBENSTEIN, MARILYN RUBENSTEIN,
IRWIN LIEBER, BARRY FINGERHUT, SETH
LIEBER, JONATHAN LIEBER, DOUGLAS
SCHIMMEL, SERF. COP., HANNAH STONE,
TERPSI CORP., DAVID LEE, JIRAKAL CORP.,
SANDLER CAPITAL MANAGEMENT, 21ST CENTURY
COMMUNICATIONS PARTNERS, L.P., 21ST
CENTURY COMMUNICATIONS T-E-PARTNERS,
L.P., 21ST CENTURY COMMUNICATIONS
FOREIGN PARTNERS L.P., SANDLER
INVESTMENT PARTNERS, SANDLER CAPITAL
MANAGEMENT, ARH CORP., EDWARD GRINACOFF,
MICHAEL J. MAROCCO, JOHN KORNREICH,
HARVEY SANDLER, ANDREW SANDLER, DAVID
LEE, ELI OXENHORN, KEN GRUBER, TATUM
CFO PARTNERS, LLP, EDWARD SCHROEDER,
ANDREW GYENES, PETER GYENES, RINO
BERGONZI, HARRISON WEAVER, MARTY HORNE
and DAVID ROWE,

              Defendants.
-------------------------------------X

02 Civ. 9356 (DAB)

<u>MEMORANDUM & ORDER</u>

DEBORAH A. BATTS, United States District Judge.

     Steven M. Harrison, James Komas, William J. Morgan, and

Harrison & Mauro Partners, (collectively "Plaintiffs") seek to

recover damages arising from Defendants' alleged fraudulent scheme to inflate artificially Cornerstone Internet Solutions Company's ("Cornerstone") common stock price between November 30, 1999 and December 29, 2000 and for Defendants' alleged insider trading.  Plaintiffs' Amended Complaint contains six counts. Counts One through Three allege securities fraud and common law fraud against certain individual Defendants who allegedly controlled Cornerstone.  Counts Four and Five allege insider trading against all Defendants both in their individual capacities and to the extent that they controlled entities that also allegedly engaged in insider trading.  Count Six seeks punitive damages against all Defendants.

Three groups of Defendants have moved separately to dismiss the Amended Complaint.  Defendants known as the "Wheatley Defendants" include Eli Oxenhorn, Irwin Lieber, Wheatley Partners II, L.P., Wheatley Partners, L.P., Wheatley Foreign Partners L.P., Woodland Ventures Fund, Seneca Ventures, Brookwood Partners, L.P., Woodland Partners, Woodland Services Corp., Applewood Capital Corp., Rev-Wood (Partnership), The Marilyn and Barry Rubenstein Family Foundation, Brian Rubenstein, Rebecca Rubenstein, Marily Rubenstein, Barry Fingerhut, Seth Lieber, and Jonathan Lieber.

The "Sandler Defendants" include Douglas Schimmel, SERF Corp., Hannah Stone, TERPSI Corp., David Lee, JIRAKAL Corp., Sandler Capital Management, Sandler Investment Partners, L.P., 21st Century Communications Partners, L.P., 21 Century Communications T-E Partners, L.P., 21 Century Communications Foreign Partners, L.P., ARH Corp., Edward Grinachoff, Michael J. Marocco, John Kornreich, Harvey Sandler and Andrew Sandler.

The "Cornerstone Defendants" include Andrew Gyenes, Peter Gyenes, Ken Gruber, Edward Schroeder, Harrison Weaver, Rino Bergonzi, Marty Horne and David Rowe.  Although Defendant Barry Rubenstein is listed among the Cornerstone Defendants by Plaintiffs, he has joined the Wheatley Defendants' Motions, not that of the Cornerstone Defendants.

The Cornerstone Defendants, Barry Rubenstein, Eli Oxenhorn, and Irwin Lieber move to dismiss the claims against them contained in Counts One through Three of the Amended Complaint as barred by the statute of limitations and for failure to state a claim for securities fraud and common law fraud pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).  All of the Wheatley Defendants and the Sandler Defendants move to dismiss the insider trading and control person claims contained in Counts Four and Five as time-barred, for failure to state an independent violation of securities law, failure to plead a prima facie case and failure

3

to state a claim pursuant to Rule 9(b).  Wheatley and Cornerstone Defendants also move to dismiss Plaintiffs' claim for punitive damages contained in Count Six on the ground that no such claim exists under New York common law.

For the reasons set forth, Defendants' Motions to Dismiss the Amended Complaint are GRANTED IN PART and Plaintiffs are DENIED leave to replead their claims.


## I.    BACKGROUND

### A.    Cornerstone and the Defendants

The following facts are taken from the Amended Complaint and are assumed to be true for purposes of deciding Defendants' Motions to Dismiss.  The Court also takes notice of documents and information that are required by law to be publicly disclosed and that are related to the allegations contained in the Amended Complaint.  Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citations omitted).

Plaintiffs assert that "the basis of the majority of the information for the frauds" alleged in the Amended Complaint "were supplied by a former a former [sic] high level individual in management for Cornerstone in June, 2002." (Amended Complaint ¶ 41 n.1.)  The Amended Complaint never identifies this individual by name nor does it specifically plead that the

individual was actually in a position to know that any of the Defendants, individually or collectively, committed fraud or insider trading between November 30, 1999 and December 29, 2000. Cornerstone, a now-bankrupt[1] Internet-based services company, publicly traded its stock on the NASDAQ stock exchange under the symbol CNRS.  Plaintiffs acquired a significant amount of Cornerstone common stock between November 30, 1999 and December 29, 2000.  (Id. ¶ 1.)  At the time Plaintiffs began acquiring significant amounts of Cornerstone common stock, the company's shares were trading at approximately $8 per share.  (See Declaration of Kenneth Rubenstein at Ex. 5.)  One year later, Cornerstone's common stock traded for approximately 6¢ per share. (Id.)

In 1999 Cornerstone had two subsidiaries:  USWeb/CKS Cornerstone ("USWeb/CKS") and B2Bgalaxy.com ("B2B").  (Amended Complaint ¶ 48.)  USWeb/CKS provided Internet and interactive technology consulting and implementation services.  (Id. ¶ 49.) B2B, formed on February 17, 1999, was a privately held company that created "industry-specific business-to-business e-commerce portals that link[ed] buyers and sellers through competitive on-

---

[1]     Cornerstone filed a voluntary petition for relief under Chapter 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York on December 26, 2001.  (Amended Complaint ¶ 41 n.2.)

line bidding with a focus on improved profitability."  (Id. ¶ 50.)

1.  Cornerstone Defendants

At all relevant times, the Cornerstone Defendants, aside from Barry Rubenstein, held the following positions:  (1) Andrew Gyenes was the CEO and Chairman of the Board of Directors of Cornerstone; (2) Peter Gyenes was a director of Cornerstone; (3) Ken Gruber was Executive Vice President and CFO of Cornerstone; (4) David Rowe was President and CEO of B2B; (5) Marty Horn was President and CEO of Foodgalaxy.com, which was owned by B2B, and later became owner of Foodgalaxy.com; (6) Edward Schroeder was President, CEO and a director of Cornerstone; (7) Harrison Weaver was a director of Cornerstone; and (8) Rino Bergonzi was also a director of Cornerstone.  (Id. ¶¶ 26-34.)  Plaintiffs characterize Barry Rubenstein as an "insider" of Cornerstone with 51% of voting control as of November 12, 1999 and 26.8% as of February 9, 2000.  (Id. ¶ 8.)  Barry Rubenstein was appointed to the Board of Directors of B2B on February 8, 2000.  (Id. ¶ 103.)

Plaintiffs allege that as a result of their positions in Cornerstone's management or on its Board of Directors, Cornerstone Defendants, including Barry Rubenstein, were able to exercise effective control of the company and were therefore

6

"controlling persons" as defined under federal securities law. (Id. ¶ 35.)

2.   Irwin Lieber and Eli Oxenhorn

The allegations of fraud contained in Counts One through Three are also directed against Irwin Lieber and Eli Oxenhorn. Irwin Lieber controlled 43.3% of voting control of Cornerstone as of November 12, 1999 and 25% as of February 9, 2000, in an individual capacity and as a general partner of Defendant Wheatley II.  (Id. ¶ 10.)  Eli Oxenhorn controlled 3.1% and 0% at those respective times, in an individual capacity and as a general partner of Defendant Revwood.  (Id. ¶ 25.)  In February, 2000, Irwin Lieber and Eli Oxenhorn were also appointed to the Board of Directors of B2B, along with Barry Rubenstein.

3.    Wheatley and Sandler Defendants

The individual Wheatley and Sandler Defendants were major stockholders of Cornerstone common stock during 1999 and 2000. (Id. ¶¶ 7-24.)  With the exception of Barry Rubenstein, Plaintiffs only allege insider trading, control liability for insider trading and claim punitive damages against the individual Wheatley and Sandler Defendants.

B.   Allegedly Fraudulent Conduct by Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber

At the heart of Plaintiffs' Amended Complaint are their

allegations, contained in Count One, that the Cornerstone Defendants (among whom Plaintiffs count Barry Rubenstein and Marty Horn) along with Eli Oxenhorn and Irwin Lieber engaged in fraudulent manipulation of the market price for Cornerstone common stock:

> The Cornerstone Defendants, Eli Oxenhorn, and Irwin Lieber employed devices, schemes, and artifices to defraud; made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engage in acts, practices and a course of business which operated a fraud and deceit upon purchasers of Cornerstone's common stock in an effort to maintain artificially high market prices for Cornerstone common stock in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5.

(Id. ¶ 161.)  Count One contains generalized allegations that these defendants, who all held high level positions at either Cornerstone or at its subsidiary B2B, acted "individually and in concert, directly and indirectly" in perpetrating the alleged fraudulent scheme and that they knowingly or recklessly disregarded Cornerstone's public dissemination of misrepresentations and omissions of material facts about the company.  (Id. ¶¶ 163-65.)

The Amended Complaint alleges that Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber caused Cornerstone to enter into two unsound business deals during 1999 and 2000 and prevented the company from publicly disclosing the full details of these deals. Plaintiffs also allege that some or all of the Defendants (the

Amended Complaint is ambiguous on this point) sold their Cornerstone common stock in 2000 and used the proceeds to acquire control of B2B.  Plaintiffs allege that this had negative consequences for Cornerstone and that Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber prevented the company from publicly disclosing the details of the transactions and the negative consequences allegedly flowing from them.  Plaintiffs also allege that some of the Cornerstone Defendants made a number of public statements during 1999 and 2000 that misrepresented the financial condition and future prospects of Cornerstone.

The purpose of Defendants' allegedly fraudulent conduct was to conceal Cornerstone's "operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock."  (Id. ¶ 165.)  Allegedly, "Had Plaintiffs known of the true performance, business practices, future prospects and intrinsic value of Cornerstone, which were not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their Cornerstone securities."  (Id. ¶ 167.)  Plaintiffs also allege that they were "induced to purchase Cornerstone common stock at artificially inflated prices" and that "they later suffered losses when the stock price fell."  (Id. ¶ 168.)

1.  Alleged Improper Dilution of B2B

Plaintiffs allege that some or all of the Defendants improperly diluted Cornerstone's ownership interest in B2B or that such alleged conduct demonstrates that the Wheatley and Sandler Defendants exercised control over Cornerstone.  (Id. ¶¶ 50-64.)  Plaintiffs allege that "[s]ometime in 1999 (no specific date was ever disclosed) 20.6% of Cornerstone's ownership in B2B was given to a third party in exchange for $37,064.00 in fixed assets."  (Id. ¶ 51.)  Plaintiffs assert that "upon information and belief the recipient of the 20.6% of B2B was one of the defendants named in this action."  (Id. ¶ 51 n.3.)  On April 30, 1999, another 11.9% ownership in B2B was transferred to third parties for $2,122,957.00, which upon information and belief, also went to one of the Defendants named in this action.  (Id. ¶ 52.)

Plaintiffs do not identify any specific individual Defendants who might have been involved in these alleged transactions (one of which occurred prior to Plaintiffs' purchase of significant amounts of Cornerstone common stock) nor does it specifically allege that these transactions were in any way fraudulent or that they were designed to affect fraudulently the price of Cornerstone common stock.  Even though these transactions apparently involved Cornerstone selling the stock of

10

B2B, which was its "wholly owned subsidiary", Plaintiffs enigmatically assert that Cornerstone received none of the proceeds, which instead went to B2B.  (Id. ¶¶ 51-52.)

These transactions were in fact publicly disclosed by Cornerstone.  (Affirmation of Andrea Lawrence at Ex. 8, Cornerstone's 10-QSB Filed January 14, 2000 ¶ 8.)  Cornerstone reported that the purpose of the transactions was to raise capital for B2B and that as of November 30, 1999, Cornerstone "owned 79.4% of B2B's common stock or 54% of B2B, assuming the conversion of B2B's Preferred Stock."  (Id.)  In its Annual Report for the fiscal year ending on May 31, 2000 (Form 10-KSB), filed on August 30, 2000, Cornerstone publicly disclosed that "[p]ursuant to certain agreements between [Cornerstone], B2B and certain B2B stockholders, the proceeds of the private placements conducted by B2B can only be used for B2B's business." (Declaration of Barry Rubenstein at Ex. D.)

Plaintiffs also cite Cornerstone press releases dated May 19, 1999 and June 19, 1999 in which the company stated that it planned to expand B2B's operations by launching new internet commerce portals in addition to its initial portal, "Foodgalaxy.com".  (Id. ¶¶ 53-54.)  Plaintiffs assert, upon information and belief, that "no other portals were ever launched."  (Id. ¶¶ 55.)  Aside from the fact that these press

11

releases were issued before the date that Plaintiffs allege that they purchased substantial amounts of Cornerstone common stock and the fact that each contained warnings to investors that "[i]n light of significant uncertainties inherent in forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Company or any other person that the objectives and plans of the Company will be achieved" (Affirmation of Andrea Lawrence at Ex. 2), the Amended Complaint contains no specific factual pleading that there was anything fraudulent about these press releases.

Plaintiffs further allege that a Cornerstone press release dated March 23, 2000 "announced that B2B (not Cornerstone) had received $1 million, plus ongoing fees, and a minority interest from an agreement to license its packaged e-commerce solution to Pet Assure." (Amended Complaint ¶ 56.) The March 23, 2000 press release contained a warning regarding forward-looking statements that was nearly identical to those contained in the previous press releases and the Amended Complaint does not specifically plead that there was anything fraudulent about the information contained in it. The Amended Complaint also does not allege that any of the three press releases were designed to affect fraudulently the price of Cornerstone common stock.

12

Plaintiffs allege that sometime in February 2000 the Wheatley Defendants and the Sandler Defendants "were the main purchasers" of 29.7% of B2B.  (Id. ¶ 58.)  They allege that "62% ownership of B2B was held by the Sandler Defendants, the Wheatley Defendants or entities controlled by them" and that "[b]y controlling B2B, Cornerstone's only real asset, the Sandler Defendants and/or the Wheatley defendants controlled Cornerstone."  (Id. ¶¶ 63-64.)  However, the only Wheatley Defendants against whom Plaintiffs allege fraud are Eli Oxenhorn and Irwin Lieber; there are no such allegations against any of the Sandler Defendants.

Barry Rubenstein, Eli Oxenhorn and Irwin Lieber were appointed to B2B's Board of Directors.  (Id. ¶ 59; Affirmation of Andrea Lawrence at Ex. 2, Cornerstone's February 8, 2000 Press Release.)  Plaintiffs allege, upon information and belief, that "Barry Rubenstein, through his inside knowledge of [Cornerstone], had a well conceived plan take [sic] personal control of the only true asset of the company - B2B."  (Id. ¶ 61.)  The Amended Complaint does not allege, however, that any such plan by Barry Rubenstein was fraudulent or aimed at fraudulently affecting the market price of Cornerstone common stock.

13

2.    An Allegedly Improper Licensing Agreement

Plaintiffs allege that sometime prior to the allegedly improper dilutions of Cornerstone's interest in B2B (a more specific time-frame is not alleged, either upon information and belief or otherwise) USWeb/CKS entered into a licensing agreement that obligated it to perform work for B2B at cost.  (Id. ¶¶ 65-69.)  According to the Amended Complaint, the licensing agreement "was patently improper and was nothing less than the defendants engaging in self-dealing."  (Id. ¶ 66.)  Cornerstone, B2B and USWeb/CKS are not defendants in this case.  Plaintiffs do not specify which of the named Defendants ought to be liable for this alleged impropriety.  Nor does the Amended Complaint allege that this allegedly improper licensing agreement was fraudulent or that it was part of a fraudulent scheme to affect the market price of Cornerstone common stock.  Plaintiffs complain, however, that the significance of the licensing agreement and its allegedly "negative impact on Cornerstone's bottom line was never disclosed."  (Id. ¶ 67.)

3.    Alleged Sham Private Placement

Plaintiffs learned from public filings with the Securities and Exchange Commission ("SEC") dated February 9, 2000 and April 4, 2000, that between December 1999 and March 2000 "the Defendants collectively sold 10,982,482 million [sic] shares of

14

Cornerstone stock with gross proceeds of $79,022,091." (Id. ¶ 102; Declaration of Steven Harrison at Ex. E.) Plaintiffs apparently allege that each of the individual Defendants "used some of the proceeds which they had realized in the sale of the 10 million shares (referred to in paragraph "101" [sic] above) to purchase additional equity in B2B." (Id. ¶ 105.) Cornerstone Defendant Ken Gruber then issued a press release on behalf of Cornerstone on February 9, 2000 "which trumpeted the 'private placement of B2B common shares' in which Defendants purchased 29.7% of B2B." (Id.)

The brief February 9, 2000 press release, however, did not actually contain information about who would participate in the private placement, but merely announced it, stating that B2B "expects to receive the entire offering amount on or about February 21, 2000." (Affirmation of Andrea Lawrence at Ex. 2, Cornerstone's February 9, 2000 Press Release.) The press release further stated that the private placement would be used primarily to finance the rollout of B2B's first e-commerce venture, Foodgalaxy.com and contained an appropriate warning regarding forward-looking statements. (Id.)

Plaintiffs allege that the private placement, announced in the February 9, 2000 press release and then confirmed again in a March 1, 2000 press release, was a sham in which "Defendants cashed out their Cornerstone stock, profiting from Defendants'

various 'pumping' press releases and other announcements which had driven up the price of the stock to that point." (Id. ¶ 107.) Plaintiffs describe the alleged sham private placement as a "non-event set up by the Defendants to make it appear that something positive had happened to Cornerstone" but that in fact it had only negative long term consequences for the company Cornerstone that were not publicly disclosed. (Id. ¶¶ 108 & 120.) Plaintiffs accordingly claim that the March 1, 2000 press release issued by Cornerstone stating that the company had raised five million dollars more than it had expected to raise through the private placement was false and misleading. (Id. ¶¶ 118-19.)

The March 1, 2000 press release did not of course refer to the private placement as a sham or as a non-event but did state that its participants included B2B "shareholders, new investors, directors and members of management." (Affirmation of Andrea Lawrence at Ex. 2, Cornerstone's March 1, 2000 Press Release.) Both the February 9th and the March 1st press releases contained statements making it clear that the B2B stocks that would be sold as part of the private placement would not be publicly traded and both contained identical warnings regarding forward-looking statements.[2] Plaintiffs also do not specify which individual

---

[2] The full warning stated:

This news release, particularly those describing Cornerstone's, FOODgalaxy.com's and B2Bgalaxy.com's future business prospects, contain [sic] forward-looking statements

Defendants were involved in this alleged sham private placement other than Ken Gruber, who allegedly caused Cornerstone to issue the February 9, 2000 press release, and Edward Schroeder.

Plaintiffs allege that "[o]n February 29, 2000 Edward Schroeder stated that they are almost finished signing an investment bank [sic]" but that upon information and belief, "Cornerstone never actually 'signed' an investment bank." (Am. Compl. ¶¶ 115-17.) Plaintiffs do not specify whether this statement was made publicly. They also do not allege that it was made with any fraudulent intent or even that it had any connection to the alleged sham private placement.

4. Defendants' Allegedly Misleading Public Statements

---

within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Actual results could differ materially from those projected in the forward-looking statements as a result of a number of factors, including difficulties in implementing desired features, delays in completing the B2Bgalaxy and various industry specific web sires, including FOODgalaxy.com, technical challenges, cost overruns, changes in design, competition, and so on, any of wich could have an adverse effect of the Company and B2Bgalaxy.com and its communities, including FOODgalaxy.com. Factors such as these could have an adverse effect on the Company's results of operations. In light of significant uncertainties inherent in forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Company or any other person that the objectives and plans of the Company will be achieved.

(Affirmation of Andrea Lawrence at Ex. 2, Cornerstone's February 9, 2000 Press Release.)

Plaintiffs allege that "the Cornerstone Defendants, through press releases, interviews, and email, made many public statements with the purpose of artificially inflating the price of Cornerstone" and that such statements were "always positive and never mentioned the significant losses which Cornerstone was incurring at the time such statements were made." (Amended Complaint ¶¶ 70-71.)  A careful reading of the Amended Complaint reveals that only Barry Rubenstein and Edward Schroeder of the Cornerstone Defendants are specifically alleged to have engaged in any fraudulent conduct.  The Amended Complaint otherwise provides only a blanket allegation that all of the Cornerstone Defendants are liable for any of Cornerstone's alleged fraudulent misrepresentations or omissions by virtue of their high level positions in the company.

The only fraudulent statement or omission specifically attributed to Barry Rubenstein is that he stated in an August 16, 1999 (before Plaintiffs allege that they acquired significant amounts of Cornerstone common stock) article in <u>Business Week</u> that:

> Cornerstone's other unit, B2BGalaxy.com, has real potential. It just launched Foodgalaxy.com, an Internet portal designed to cut the cost of food and supplies for restaurants and other food service providers.  The system links buyers and sellers through competitive online bidding.  Some 50 restaurants have signed up, including New York's Tavern on the Green and Sardis.

18

(Id. ¶ 73; Declaration of Barry Rubenstein at Ex. A.)  Plaintiffs complain that the purpose of the statement and the article was to "hype" B2B, but do not actually allege that any part of the statement was false or fraudulent.  Rather the Amended Complaint alleges that certain projections about the financial performance of Cornerstone made by "an analyst" – and not attributable to Barry Rubenstein – turned out to be too optimistic.  (Id. ¶¶ 73-74.)  The Amended Complaint contains no other specific allegations of fraud against Barry Rubenstein.

Plaintiffs allege that Cornerstone issued a press release dated November 4, 1999, that stated that Defendant Edward Schroeder "expects Foodgalaxy.com to have about 300 food-purchaser subscribers by the end of the year, using the site to line up about $300 million in annualized purchases.  By the end of 2001, he expects to have 33,000 buyers on the system, arranging about $27 billion in transactions."  (Id. ¶ 79.) Plaintiffs contend that Edward Schroeder's expectations were "never realized; now [sic] were they realistic."  (Id. ¶ 80.) The statement attributed to Edward Schroeder is not, however, alleged to have been false or fraudulent.

Plaintiffs also allege that Edward Schroeder "[i]n a December 13, 1999 'dialogue' with an investor . . . stated that '[w]e have a chance of being profitable in our services business during our current fiscal year (ending 5/31/2000) but do not

19

expect to reach profitability in our B2B initiative based on the need to invest heavily in Marketing and Sales.'"  (Id. ¶ 84.) The Amended Complaint does not specify whether the statements made during this "dialogue with an investor" were made publicly. Nevertheless, Plaintiffs allege upon information and belief that "Schroeder made such positive statements, knowing that they were false."  (Id. ¶ 89.)  According to the Amended Complaint, at the time Edward Schroeder made these statements, he knew that Cornerstone had lost $2,190,000 in the six month period ending on November 30, 1999 and that "the consulting division [USWeb/CKS Cornerstone] was in deep trouble."  (Id. ¶ 85.)  In an October 22, 1999 SEC filing, a month prior to Plaintiffs' acquisition of substantial amounts of Cornerstone common stock, Cornerstone in fact publicly disclosed that for the fiscal year ending on May 31, 1999 and for the three months ending on August 31, 1999, the company "incurred net losses of $3,645,350 and $1,035,031, respectively."  (Affirmation of Andrea Lawrence at Ex. 10, Cornerstone's Form S-8 Filled October 22, 1999 at 5.)

Eli Oxenhorn and Irwin Lieber, by virtue of their positions at B2B, are also alleged to have been "primary participants" in the securities fraud that Plaintiffs allege.  (Id. ¶ 161 & 164.) Plaintiffs appear to conclude that Eli Oxenhorn and Irwin Lieber "effectively controlled Cornerstone" through their positions on B2B's Board of Directors since B2B was allegedly "the only asset

20

of Cornerstone". (Id. ¶ 164 n.11.)  The Amended Complaint, however, contains no specific allegations that Eli Oxenhorn and Irwin Lieber were responsible any statements or omissions that were fraudulent or that were part of the alleged fraudulent scheme to affect Cornerstone common stock price.

Plaintiffs also allege that a number of other press releases and public filings issued by Cornerstone contained material misrepresentations and omissions. (Id. ¶¶ 91-93.)  The Amended Complaint, however, does not specifically allege that any of the individual Defendants were responsible for these alleged misrepresentations.  Moreover, while Plaintiffs allege that Cornerstone and its high-level officers only ever issued positive public statements about the company's prospects and its financial condition, this appears not to have been the case.

Particularly noteworthy are the stark warnings contained in an SEC filing dated October 22, 1999 - again before Plaintiffs allegedly purchased their shares.  Among the four pages of "Risk Factors" associated with investing in Cornerstone securities that the filing detailed is a heading that stated "WE HAVE INCURRED SUBSTANTIAL OPERATING LOSSES AND MAY NEVER BECOME PROFITABLE." (Affirmation of Andrea Lawrence at Ex. 10, Cornerstone's Form S-8 Filed October 22, 1999 at 5.)  The filing disclosed that as of August 31, 1999 Cornerstone's "accumulated deficit was $34,357,752." (Id.)  Further, the filing disclosed than an

21

independent auditors' report on the Cornerstone's financial statements for the fiscal year ending on May 31, 1999 "states that our recurring losses from operations raise substantial doubt about our ability to continue as a going concern."  (Id.) Cornerstone warned that it "may never achieve or sustain significant revenues or profitability on a quarterly or annual basis in the future."  (Id.)

## C.    Defendants' Alleged Insider Trading

In Counts Four and Five of the Amended Complaint, Plaintiffs allege, upon information and belief based on SEC public filings, that all of the Defendants engaged in insider trading between November 30, 1999 and March 2000 in violation of 15 U.S.C. §§ 78t-1 and 78(a).  (Amended Complaint ¶¶ 136 & 182 n.12.) Plaintiffs allege that "[t]hrough their previous social and/or business relationships with Barry Rubenstein, the other Cornerstone Defendants, Eli Oxenhorn, and Irwin Lieber, the Sandler Defendants and the Wheatley Defendants were in a position, and in fact were informed of" material nonpublic information regarding Cornerstone.  (Id. ¶ 181.)  Upon information and belief, Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber are alleged to have been "tippers" who provided "material nonpublic information to individuals who in turn used such information to make 'insider' trades."  (Id. ¶ 183.)

22

Plaintiffs allege that they purchased shares of Cornerstone common stock contemporaneously with the alleged insider trades which allegedly resulted in Defendants collectively realizing "a profit of more than $100 million."  (Id. ¶¶ 184-85.)

Plaintiffs contend that Cornerstone hid the fact that it lost $8,383,225 between November 30, 1999 and May 31, 2000 until after all of the alleged insider trades were completed, alleging that "[t]he first disclosure of any negative news was not until after all of the insider selling was completed (approximately March 24, 2000)."  (Id. ¶ 131.)  Negative news concerning Cornerstone's weak financial condition was the allegedly non-public information that Defendants allegedly traded on.

Nevertheless, Plaintiffs acknowledge that on January 14, 2000, while the alleged insider trades were ongoing, Cornerstone publicly disclosed that it had an operating loss of at least $2,190,000 for the six months ending on November 30, 1999.  (Id. ¶ 128.)  And in addition, as discussed above, Cornerstone had publicly disclosed a great deal of information about its weak financial condition on October 22, 1999.  Regardless, Plaintiffs allege that "[d]uring the five months from November 30, 1999 to March, 2000, while Defendants were aware of the negative information that was withheld from the public, Defendants sold the majority of the Cornerstone stock which they owned."  (Id. ¶ 136.)

23

D.    Plaintiffs' Claim for Punitive Damages

In Count Six of the Amended Complaint, Plaintiffs assert that they "seek to recover the amount of money they would have made had Defendants not engaged in willful and fraudulent activities that caused the price of the stock to overly inflate," which they calculate to be at least two million dollars.  (Id. ¶ 189.)


III. DISCUSSION

A.    The Legal Standard for a Motion to Dismiss

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff."  Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted).  A district court "should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119 (2d Cir. 1991)).

For purposes of a motion to dismiss, a complaint is deemed to include:

any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, <u>see</u> <u>Cosmas v. Hassett</u>, 886 F.2d 8, 13 (2d Cir. 1989), as well as public disclosure documents required by law to be, and that have been, filed with the SEC, <u>see</u> <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991), and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit, <u>see</u> <u>Cortec Industries, Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47-48 (2d Cir. 1991).

<u>Rothman v. Gregor</u>, 220 F.3d 81, 88-89 (2d Cir. 2000).

## B.   The Securities Fraud Claims

Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber move to dismiss the securities fraud claim contained in Count One of the Amended Complaint arguing that it is barred by the statute of limitations and that it is inadequately pled.

### 1.  The Statute of Limitations

Pre-Sarbanes-Oxley Act claims under federal securities law must be commenced "within one year after the discovery of the facts constituting the violation and within three years after such violation."  <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 364 (1991); <u>see also</u> <u>Dodd v. Cigna Securities, Inc.</u>, 12 F.3d 346, 349 (2d Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 1401 (1994).  The statute of limitations begins to run "after the plaintiff 'obtains actual knowledge of the facts, giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."  <u>LC Capital Partners LP v. Frontier Ins. Group, Inc.</u>,

25

318 F.3d 148, 154 (2d Cir. 2003) (quoting <u>Kahn v. Kolberg,</u>

<u>Kravis, Roberts & Co.,</u> 970 F.2d 1030, 1042 (2d Cir. 1992))

(emphasis omitted); <u>see also</u> <u>Clark v. Nevis Capital Management</u>

<u>LLC</u>, 2005 WL 488641 at *6 (S.D.N.Y. 2005) ("Discovery of facts

for the purposes of this statute of limitations includes

constructive or inquiry notice, as well as actual notice.")

(citation and internal quotations omitted).  "Inquiry notice --

often called 'storm warnings' in the securities context -- gives

rise to a duty of inquiry 'when the circumstances would suggest

to an investor of ordinary intelligence the probability that she

has been defrauded.'"  <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396

F.3d 161, 168 (2d Cir. 2005) (quoting <u>Levitt v. Bear Stearns &</u>

<u>Co., Inc.</u>, 340 F.3d 94, 101 (2d Cir. 2003)).  A plaintiff is

deemed to have inquiry notice when the suspected fraud is

"probable, not merely possible."  <u>Newman v. Warnaco Group, Inc.</u>,

335 F.3d 187, 193 (2d Cir. 2003).

Where a duty of inquiry has arisen, knowledge of the fraud

will be imputed to the investor in one of two ways, depending on

whether the investor undertakes some inquiry:  "[i]f the investor

makes no inquiry once the duty arises, knowledge will be imputed

as of the date the duty arose" but "if the investor makes some

inquiry once the duty arises, we will impute knowledge of what an

investor in the exercise of reasonable diligence, should have

discovered concerning the fraud."  <u>LC Capital</u>, 318 F.3d at 154

(internal quotations and citations omitted).  However, even if there are "some ominous indicators, investors may not be considered to have been placed on inquiry notice [if] the warning signs are accompanied by reliable words of comfort from management."  Id. at 155.  Additionally, the determination of whether a plaintiff had sufficient facts to put him on inquiry notice is "often inappropriate for resolution on a motion to dismiss," but may be resolved on a motion to dismiss "where the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint."  Id. at 156.

Defendants argue that any securities fraud claim against them is barred by the one year statue of limitations because Plaintiffs were on notice of the alleged fraud more than one year prior to the filing of this action on November 22, 2002. Cornerstone Defendants concede, however, that at a minimum, Plaintiffs were on "inquiry notice" of the fraud alleged in the Amended Complaint "by no later than January 26, 2001" when Cornerstone acknowledged that some of their publicly disclosed financial reports had been prepared using improper accounting methods.  (Cornerstone's Reply at 7.)  Plaintiffs assert that it was only after Cornerstone's January 26, 2001 disclosure that "it became apparent to begin our investigation" into the alleged

27

fraud and that accordingly that they were on inquiry notice only as of that date.  (Declaration of Steven Harrison ¶¶ 63 & 70.)

Plaintiff Steven Harrison asserts that he diligently investigated the possibility of fraud after January 26, 2001:  "I tried to find out what I could about Cornerstone.  I contacted private investigators, and did exhaustive research in attempt [sic] to contact anyone had [sic] any personal dealings of knowledge of Cornerstone [sic]."  (Id. ¶ 71.)  Steven Harrison claims that he "could not confirm the securities fraud until June, 2002 when I came in touch with a former high level individual in management for Cornerstone."  (Id. ¶ 70.)

The Court finds that Plaintiffs were not on inquiry notice of the fraud that they allege any earlier than January 26, 2001 when it appeared that some fraud was "probable, not merely possible."  Newman, 335 F.3d at 193.  Further, since Plaintiffs claim to have exercised diligence after their duty of inquiry arose, it is inappropriate at this stage for the Court to determine at what point after January 26, 2001 they should reasonably have known of the fraud they allege.  See In re Integrated Resources Real Estate Limited Partnerships Securities Litig., 815 F. Supp. 620, 638 (S.D.N.Y. 1993) (holding that the question of whether a plaintiff reasonably exercised due diligence after being placed on inquiry notice of securities fraud is "usually a question of fact for the jury to decide"); In

28

re Global Crossing Ltd. Securities Litigation, 313 F. Supp.2d 189, 204 (S.D.N.Y. 2003) ("it is a question of fact for ultimate resolution at trial (or on summary judgment if the factual record permits only one conclusion) whether plaintiffs in the exercise of reasonable diligence would have discovered the facts underlying the present claim more than one year before those claims were asserted").  Accordingly, Defendants' Motions to Dismiss Count One of the Amended Complaint on statute of limitations grounds are DENIED.

2.  Pleading Requirements for Securities Fraud Claims

To state a cause of action for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated pursuant to it (17 C.F.R. § 240.10b-5(b)) "'a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff's reliance on defendant's action caused [plaintiff] injury.'"  Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000) (quoting Chill v. General Electric Co., 101 F.3d 263, 266 (2d Cir. 1996)).[3]

---

[3]    Rule 10b-5 provides in full:

§ 240.10b-5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality

Securities fraud claims must be pled with sufficient specificity under Rule 9(b) of the Federal Rules of Civil Procedure:  "'The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based.'"  <u>Novak v. Kasaks</u>, 216 F.3d 300, 314 (2d Cir. 2000) (quoting <u>Ross v. Bolton</u>, 904 F.2d 819, 823 (2d Cir. 1990).  Rule 9(b) requires a party averring fraud or mistake to state with particularity "the circumstances constituting [the] fraud or mistake."  Fed. R. Civ. P. 9(b).

The "particularity requirement" contained in Rule 9(b) is substantial:  "'[A] complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and

---

of interstate commerce, or of the mails or of any facility of any national securities exchange,

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

"The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)."  <u>See</u> <u>SEC v. Zandford</u>, 122 S.Ct. 1899, 1901 n.1 (2002).

identify those responsible for the statements."'  Kelly v. L.L. Cool J., 145 F.R.D. 32, 38 (S.D.N.Y. 1992) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)); see also DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) (same); Keenan v. D.H. Blair & Co., 838 F.Supp. 82, 86 (S.D.N.Y. 1993) (same); Kubin v. Miller, 801 F.Supp. 1101, 1117 (S.D.N.Y.1992) (same).

In addition, "[w]hen fraud is alleged against multiple defendants, a plaintiff must . . . set[ ] forth separately the acts complained of by each defendant."  Double Alpha, Inc. v. Mako Partners, L.P., 2000 WL 1036034 at *3 (S.D.N.Y. 2000); see also T.H.C., Inc., v. Fortune Petroleum Corp., 1999 WL 182593 at *3 (S.D.N.Y. 1999) ("'Courts are especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants'") (quoting Scone Investments, L.P. v. American Third Market Corp., 1998 WL 205338 at *4 (S.D.N.Y. 1998))).  The requirements of Rule 9(a) are not "satisfied by a complaint in which defendants are clumped together in vague allegations."  In re Blech Securities Litigation, 928 F.Supp. 1279, 1294 (S.D.N.Y. 1996).

Plaintiffs' factual pleadings, read in the most favorable light, fail to state a claim for securities fraud against Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber for three overlapping reasons.  First, many of the allegations

contained in the Amended Complaint describe, at most, non-actionable corporate mismanagement.  Second, the core claim, that Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber schemed to inflate artificially Cornerstone's common stock price, is based on the alleged concealment of Cornerstone's weak financial condition, whereas in fact such information was repeatedly publicly disclosed throughout 1999 and 2000.  The weak financial condition of Cornerstone was clearly set forth in Cornerstone's October 22, 1999 Form S-8 SEC filing.  This document was filed before any alleged stock purchases by Plaintiffs.  Finally, those few specific allegedly fraudulent statements that Plaintiffs attribute to individual Defendants are either clearly immaterial statements of opinion or are statements accompanied by appropriate cautions to investors regarding forward looking statements.  No reasonable investor would have relied on those statements, particularly in light of Cornerstone's public disclosures regarding its poor financial condition.

> a.    Allegations of corporate mismanagement at Cornerstone

The Amended Complaint contains groups of generalized allegations that the Defendants are responsible for (1) the improper dilution of Cornerstone's ownership interest in B2B (Amended Complaint ¶¶ 50-52), (2) an improper technology development and licensing agreement that the company entered (<u>Id.</u>

¶¶ 65-69) and (3) the orchestration of a sham private placement of B2B common stock that allegedly negatively affected Cornerstone (Id. ¶¶ 50-52).  Plaintiffs do not specifically allege that any of the individual Defendants' conduct was fraudulent in connection with either the "improper" dilution or the "improper" agreement.  Similarly with regard to the alleged "sham" private placement, Plaintiffs fail to allege specifically that any of the individual Defendants' engaged in fraudulent conduct.

Plaintiffs only allege that the improper dilution, improper licensing agreement and sham private placement resulted in negative consequences for Cornerstone's business.  Even assuming that that is so, however, does not mean that Cornerstone or any of the individual Defendants committed securities fraud.  Plaintiffs' "Allegations of mismanagement do not state a claim for securities fraud."  O & G Carriers, Inc. v. Smith, 799 F. Supp. 1528, 1540 (S.D.N.Y. 1992) (citation omitted).  As the Second Circuit has observed "it is well established by now that section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception."  Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982) (citing Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 473, 479 (1977)).

33

Furthermore, Defendants' failure to disclose publicly any mismanagement that may have occurred at Cornerstone was not a violation of federal securities law.  See Ciresi v. Citicorp, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) ("the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement") (citing United States v. Matthews, 787 F.2d 38 (2d Cir. 1986); GAF Corp. v. Heyman, 724 F.2d 727 (2d Cir. 1983); Maldonado v. Flynn, 597 F.2d 789 (2d Cir. 1979); Management Assistance, Inc. v. Edelman, 584 F. Supp. 1021 (S.D.N.Y. 1984)). Cornerstone was also under no duty to "to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner" in its public disclosures.  Ballan v. Wilfred Am. Educ. Corp., 720 F. Supp. 241, 249 (E.D.N.Y. 1989).

The Amended Complaint does not explicitly state that the alleged improper dilution, alleged improper licensing agreement and alleged sham private placement were part of the scheme to inflate artificially Cornerstone's common stock price, as alleged in Count One.[4]  Reading Plaintiffs' allegations in the most favorable light, however, the Court deems the Amended Complaint to do just that.  Even on such a reading of the improprieties alleged in the Amended Complaint, Plaintiffs fail to state a

---

[4]    The Amended Complaint generally alleges that Cornerstone Denfendants, Eli Oxenhorn and Irwin Lieber "employed devices, schemes, and artifices to defraud" to inflate artificially Cornerstone's common stock price.  (Amended Complaint ¶ 161.)

34

claim that Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber schemed to inflate fraudulently the price of Cornerstone's common stock price.

As the Second Circuit has observed "[i]t is long settled that a securities fraud plaintiff "must prove both transaction and loss causation." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)).  Plaintiffs have adequately alleged transaction causation by their claim that they "would not have purchased or otherwise acquired their Cornerstone securities", (Amended Complaint ¶ 167), but for the alleged misrepresentations and omissions of Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber.  See Id. ("Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction'" (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)).  Plaintiffs have failed, however, to plead adequately loss causation.

To plead adequately loss causation in support of a securities fraud claim "'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or

35

omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Id. at 173 (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added)).  As with other aspects of securities fraud pleading, plaintiffs must allege specific facts to establish loss causation:

> It is not enough to allege that a defendant's misrepresentations and omissions induced a "purchase-time value disparity" between the price paid for a security and its "true 'investment quality'" . . . Such an allegation - which is "nothing more than a paraphrased allegation of transaction causation - explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment."

Id. at 174 (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003)).  Specifically:

> "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately ple[ ]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events" . . . . Though all reasonable inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, "conclusions of law or unwarranted deductions of fact are not admitted."

Id. at 174-75 (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771-72 (2d Cir. 1994)).

Plaintiffs allege that fraudulent misrepresentations and omissions by Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber induced them to purchase Cornerstone common stock between

36

November 30, 1999 and December 29, 2000, and to do so at "artificially inflated" prices.  (Amended Complaint ¶¶ 166-168.)  Similarly, the plaintiffs in <u>Lentell</u> charged defendant Merrill Lynch with securities fraud, alleging that its misrepresentations and omissions with respect to a recommendation to purchase certain securities had caused plaintiffs to acquire those securities at artificially inflated prices.  <u>Id.</u> at 175.  The court there held, however, that while the plaintiffs' allegations sufficiently plead transaction causation, they did not provide the "necessary casual link between [defendant's] fraud and plaintiffs' losses."  <u>Id.</u>  Specifically, the court observed that "plaintiffs allege no loss resulting from the market's realization that [defendant's] opinions were false, or that [defendant] concealed any risk that could plausibly (let alone foreseeably) have caused plaintiffs' loss."  <u>Id.</u> at 176.

Plaintiffs here have likewise failed to allege that any of the alleged misrepresentations attributed to Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber, once their falsity became known to the market, caused a decline in Cornerstone common stock price.  Plaintiffs' allegations regarding the improper licensing agreement, improper dilution and sham private placement also do not serve to establish loss causation because, as discussed above, Cornerstone was not obliged to disclose publicly these incidents of alleged mismanagement.  In any event,

the very fact that Cornerstone common stock price steadily declined between November 30, 1999 and December 29, 2000, even in the absence of any public disclosure of the mismanagement that Plaintiffs allege, tends to suggest that the price of the stock declined for other reasons.

As discussed below, Plaintiffs' few specific allegations that individual Cornerstone Defendants, Eli Oxenhorn or Irwin Lieber made public statements misrepresenting "the true performance, business practices, future prospects and intrinsic value of Cornerstone" also do not suffice as pleadings of loss causation.  Cornerstone, in several public filings with the SEC throughout 1999 and 2000, quite explicitly disclosed that it was an unprofitable company that might well go out of business and that therefore investing in the company would naturally be risky. The court's observations in Lentell that the plaintiffs' allegations of securities fraud failed to "grapple in any meaningful way with the complexity of the [defendants' investment recommendations] that form the basis of their claims or, for that matter, to account for the price-volatility risk inherent in the stocks they chose to buy" apply equally to the Plaintiffs before this Court.  Id. at 176.  The steady decline in the market price for Cornerstone common stock between November 30, 1999 and December 29, 2000 may have had many causes but Plaintiffs have not successfully pled that fraud was one of them.

38

b.     Plaintiffs' generalized allegations that
       Cornerstone concealed its financial condition

Plaintiffs' key claim that Cornerstone Defendants, Eli
Oxenhorn and Irwin Lieber engaged in a scheme to affect
fraudulently the market price of Cornerstone common stock is
based on numerous allegations that these individuals knowingly or
recklessly failed to disclose publicly mismanagement of
Cornerstone and failed to disclose the company's serious
financial problems both before and during the period in which
Plaintiffs acquired the company's stock.  And at the same time,
Plaintiffs allege that these Defendants issued overly optimistic
public statements concerning Cornerstone's prospects or caused
the company to do so, thereby compounding the effect of their
omissions.  Since the market for Cornerstone securities was
efficient, Plaintiffs allege that these Defendants'
misinformation and misrepresentations were duly absorbed by the
investing public:  "Cornerstone stock was followed by securities
analysts employed by major brokerage firms who prepared public
reports that were distributed to their sales forces and customers
. . . Cornerstone regularly issued press releases which were
carried by national newswires and each release was accessible by
the public."  (Amended Complaint ¶ 155.)  The price of
Cornerstone common stock thus allegedly became over-valued.  (Id.
¶ 156.)

39

As discussed above, Cornerstone and therefore Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber were under no duty to disclose publicly the mismanagement that Plaintiffs allege in connection to the allegedly improper dilution of Cornerstone's ownership of B2B, the improper licensing agreement and the alleged sham private placement.  And contrary to claims that Cornerstone concealed its precarious financial condition, the company's 1999 and 2000 public filings with the SEC demonstrate that it was candid about its lack of profitability, poor prospects and consequent high risk as an investment.

Cornerstone's October 22, 1999 filing with the SEC (a full month before Plaintiffs allege that they acquired substantial amounts of Cornerstone common stock) contained extensive warnings about the potential risks of investing in the company's securities, disclosed that the company was running a deficit of tens of millions of dollars, that it had recently lost millions of dollars more and that its independent auditors doubted that it could stay in business.  (Affirmation of Andrea Lawrence at Ex. 10, Cornerstone's Form S-8 Filed October 22, 1999 at 5.) Cornerstone admitted:  "We have incurred a net loss in each year of our existence, and have financed our operations primarily through sales of equity and debt securities."  (Id.)  The filing contained the following prominent warning:  "WE HAVE INCURRED SUBSTANTIAL OPERATING LOSSES AND MAY NEVER BECOME PROFITABLE."

40

(Id.)  Plaintiffs also had other warnings regarding Cornerstone's financial condition prior to November 30, 1999, when Plaintiffs allege that they began to acquire significant amounts of Cornerstone common stock.  For instance, the August 16, 1999 Business Week article, which Plaintiffs claim contained misrepresentations regarding Cornerstone's financial condition and prospects, specifically noted that the company "is still in the red."  (Declaration of Barry Rubenstein at Ex. A.)

Cornerstone continued to disclose publicly its poor financial condition throughout 2000.  Cornerstone's SEC Form 10-QSB filing dated January 14, 2000 for the fiscal quarter ending on November 30, 1999 warned that the "Company's continuing losses from operations could impact the Company's ability to meet its obligations as they become due" and reiterated that an independent auditor's report for the fiscal year ending on May 31, 1999 expressed substantial doubt about Cornerstone's ability to continue as a going concern.  (Affirmation of Andrea Lawrence at Ex. 8.)  In its SEC Form 10-KSB dated August 29, 2000 for the fiscal year ending on May 31, 2000, Cornerstone further warned that its "operating results in any given quarter may fall bellow the expectations of securities analysts and investors" in which case "the trading price of the Company's Common Stock would likely be materially and adversely affected and litigation may ensue."  (Id. at Ex. 4.)  The Form 10-KSB advised that

Cornerstone's common stock was in danger of being de-listed from the NASDAQ stock exchange because the price of its common stock was starting to dip below the minimum $1 bid price. (Id.) Cornerstone also noted the extreme volatility of its stock price: "Between June 1, 1999, and August 20, 2000, the closing price of the Company's Common Stock has ranged between $0.81 and $12.31." (Id.) Indeed, Cornerstone anticipated that the price volatility of its common stock along with the general volatility of many technology companies' securities would likely result in a spate of securities litigation such as the suit brought by Plaintiffs: "In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been instituted against such a company." (Id.)

A corporation's public disclosure of the type of negative information described above can hardly be an effective means of artificially inflating the price of its securities nor do such disclosures logically comport with the sort of fraudulent scheme that Plaintiffs allege. The public disclosure of such negative information would have provided a reasonable investor with strong indications of possible mismanagement at Cornerstone and indications certainly that the company was a high risk investment. Plaintiff Steven Harrison, while asserting that "the fact is that the Defendants perpetrated a major fraud against all

**42**

of Cornerstone's stockholders and kept that fraud hidden while they profited therefrom," informed the Court of the following:

> I am a practicing Certified Public Accountant.  Since the plaintiffs and I had invested a substantial sum of money into Cornerstone, I diligently monitored every disclosed document related to Cornerstone as they were made available to the public, as well as every news article related to Cornerstone, as any investor in my position would.

(Declaration of Steven Harrison ¶ 62.)  Thus by his own account, Plaintiff Steven Harrison should have been aware of the cautionary language contained in many of Cornerstone's public disclosures and of the investment risks to which they pointed.

A plaintiff alleging a fraudulent scheme to inflate artificially the value of publicly traded securities by concealing adverse financial information or investment risk must carefully and specifically allege facts that would establish causation when "substantial indicia of the [allegedly concealed investment risk] that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk."  Lentell, 396 F.3d at 177.  As discussed above, Cornerstone's public disclosures repeatedly contained warnings that would have indicated to a reasonable investor that it was a risky investment.  Under these circumstances, for Plaintiffs to plead adequately a fraudulent scheme to artificially inflate Cornerstone's common stock price, they must allege:

> (i) facts sufficient to support an inference that it was defendant's fraud-rather than other salient factors-that

> proximately caused plaintiff's loss; or (ii) facts
> sufficient to apportion the losses between the disclosed and
> concealed portions of the risk that ultimately destroyed an
> investment.

Id. Plaintiffs' Amended Complaint does not allege either

category of facts and therefore fails to plead adequately

securities fraud on the theory that Cornerstone Defendants, Eli

Oxenhorn and Irwin Lieber schemed to inflate artificially the

price of Cornerstone common stock.

In addition, Plaintiffs' other allegations that Cornerstone

Defendants (to the extent they are individually identified at

all), Eli Oxenhorn and Irwin Lieber made public statements

misrepresenting the true financial condition of Cornerstone

clearly refer to mere opinions in press releases that also

contained appropriate and adequately specific warnings to

investors that forward-looking statements should not be relied

upon.  The Court finds that such statements of opinion simply

were not material and that no reasonable investor would have

relied upon them, especially in light of Cornerstone's repeated

public disclosures regarding its financial condition.  See Basic

Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (observing that for

securities fraud allegations "to fulfill the materiality

requirement 'there must be a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the

reasonable investor&#8639;&#8639; as having significantly altered the

**44**

'total mix' of information made available'") (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Plaintiffs have alleged that individual Cornerstone Defendant Edward Schroeder made a number of public statements that were intended to inflate artificially Cornerstone's common stock price by misrepresenting the company's financial condition. (Amended Complaint ¶¶ 79, 80, 84, 85 & 89.)  The Court finds that none of those statements were material in light of Cornerstone's public disclosures regarding its poor financial condition. Accordingly, Count One of the Amended Complaint against Edward Schroeder is DISMISSED.

As to individual Cornerstone Defendant, Barry Rubenstein, Plaintiffs merely allege that he made a public statement in Business Week magazine intended to "hype" Cornerstone's subsidiary B2B.  (Id. ¶¶ 73-74.)  The statement was clearly immaterial.  The Amended Complaint contains no other specific allegations of fraud against Barry Rubenstein.  Accordingly, Count One of the Amended Complaint against Barry Rubenstein is DISMISSED.

The Amended Complaint alleges that individual Cornerstone Defendant Marty Horn made a single public statement regarding the prospects of Cornerstone's newly launched subsidiary B2B:  "There is tremendous opportunity in developing this untapped and under-served market."  (Id. ¶ 53.)  The statement clearly was an

opinion and the press release in which it was contained ended with a warning to investors not to rely on any forward-looking statements such as the one made by Marty Horn.  Since there are no other specific allegations of fraud against Marty Horn, Count One of the Amended Complaint against him is also DISMISSED.

The Amended Complain contains no specific allegations that Eli Oxenhorn and Irwin Lieber were responsible any statements or omissions that were fraudulent or any specific allegations that they were part of a fraudulent scheme to affect Cornerstone common stock price.  The Court therefore finds that Plaintiffs have failed to plead adequately securities fraud with respect to these individual Defendants.  Accordingly, Count One of the Amended Complaint against Eli Oxenhorn and Irwin Lieber is DISMISSED.

To sustain a claim of securities fraud against each of the remaining individual Cornerstone Defendants, Plaintiffs' Amended Complaint was required to "alleg[e] specific acts of wrongdoing as to each one of them."  Double Alpha, Inc. v. Mako Partners, L.P., 2000 WL 1036034 at *3 (S.D.N.Y. 2000).  The Amended Complaint does not, however, specifically allege that the remaining individual Cornerstone Defendants committed any fraudulent acts or omissions.  Accordingly, Count One of the Amended Complaint as to all other remaining individual

46

Cornerstone Defendants, Andrew Gyenes, Peter Gynes, Rino

Bergonzi, Harrison Weaver and David Rowe, is also DISMISSED.


C.    "Control Person" Liability

Section 20(a) of the Securities Exchange Act provides:

Every person who, directly or indirectly, controls any
person liable under any provision of this chapter or
of any rule or regulation thereunder shall also be
liable jointly and severally with and to the same
extent as such controlled person to any person to
whom such controlled person is liable, unless the
controlling person acted in good faith and did not
directly or indirectly induce the act or acts
constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to establish a prima facie case of liability under

§ 20(a), a plaintiff must show:  (1) a primary violation by a

controlled person; (2) control of the primary violator by the

defendant; and (3) "that the controlling person was in some

meaningful sense a culpable participant" in the primary

violation.  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.

1998) (quoting First Jersey, 101 F.3d at 1472); see also Suez

Equity Investors, 250 F.3d at 101 (stating that "[c]ontrolling-

person liability is a form of secondary liability, under which a

plaintiff may allege a primary § 10(b) violation by a person

controlled by the defendant and culpable participation by the

defendant in the perpetration of the fraud").

Assuming for the purposes of this discussion that the Amended Complaint properly alleged a primary violation of securities law by a controlled person, Plaintiffs must allege facts sufficient to satisfy the second element of a prima facie claim:  control.  Control over a primary violator may be established by showing that the defendant possessed "'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  First Jersey, 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b-2).  A complaint must allege facts from which it can be inferred that the defendant had actual power or influence over the controlled person.  See Silva Run Worldwide Ltd. v. Gaming Lottery Corp., 1998 WL 167330 at *13 (S.D.N.Y. 1998); see also Gabriel Capital, L.P. v. Natwest Fin., Inc., 122 F. Supp.2d 407 at 426-27 (S.D.N.Y. 2000) ("To survive a motion to dismiss, a plaintiff [must] plead facts supporting a reasonable inference of control.").  However, pleading officer or director status alone is not enough.  See In re Livent, Inc. Securities Litigation, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999).  Similarly, pleading legal conclusions do not suffice.  See Primavera Familienstiftung v. Askin, 1996 WL 494904 at *11 (S.D.N.Y. 1996) (holding that for purposes of a motion to dismiss the Court need not accept as true allegations which amount to legal conclusions).

48

Finally, in order to state a claim under Section 20(a) Plaintiff must also plead "culpable participation" of the particular defendant in the alleged fraud.  Where a complaint contains no detailed allegations regarding the state of mind of the "control person," a Section 20(a) claim must be dismissed for failure to allege culpable participation.  See In re Deutsche Telekom AG Securities Litig., 2002 WL 244597 at *6 (S.D.N.Y. 2002) (stating that "[c]ulpable participation must be pled to allege control person liability pursuant to section 20(a) as a consequence of the pleading requirements of the PSLRA that require that where money damages are recoverable 'on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'").  The courts have applied various standards to evaluate whether the "culpable participation" pleading requirement has been met.  See, e.g., Mishkin v. Ageloff, 1998 WL 651065 at *25 (requiring the pleading of "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud"); Gabriel Capital, 122 F. Supp. 2d at 426-28 (requiring the pleading of "facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom the person had control, was

49

engaging in fraudulent conduct"); <u>Steed Finance LDC v. Nomura</u> <u>Securities Int'l, Inc.</u>, 2001 WL 1111508 at *10 (S.D.N.Y. 2001), (requiring the pleading of either "conscious misbehavior or recklessness").

The Amended Complaint does not allege any specific facts that would support a claim of control person liability against any of the individual Cornerstone Defendants, Eli Oxenhorn or Irwin Lieber.  Plaintiffs do not allege any specific primary violator nor do they allege any specific facts to support their conclusory charge that Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber are liable under Section 20(a) of the Securities Exchange Act as control persons.  Accordingly, Count Two of the Amended Complaint against each of the individual Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber is DISMISSED.

D.    Common Law Fraud

Count Three of the Amended Complaint alleges that Cornerstone Defendants, Eli Oxenhorn and Irwin Lieber committed common law fraud.  (Amended Complaint ¶¶ 175-78.)  "To state a claim for common law fraud in New York, a plaintiff must allege 1) the defendant's misrepresentation or omission of a material fact, 2) the defendant's intent to deceive plaintiff, 3) justifiable reliance upon the misrepresentation by the defrauded party, and 4) that the plaintiff's injury was caused by the

50

defendant's misrepresentation or omission." <u>Morse v. Weingarten</u>, 777 F. Supp. 312, 319 (S.D.N.Y. 1991); <u>see</u> <u>also</u> <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 421 (1996).  Moreover, "[b]ecause these elements are substantially identical to those governing § 10(b), the identical analysis applies." <u>Morse</u>, 777 F. Supp. at 319.

Since the Amended Complaint fails to state a claim for securities fraud against any of the individual Cornerstone Defendants, Eli Oxenhorn or Irwin Lieber, Count Three of the Amended Complaint against each of these Defendants is also DISMISSED.

**E.   Insider Trading Claims**

Plaintiffs charge all defendants with violations of Section 20A of the Securities and Exchange Act of 1934.  Section 20A provides that:

> Any person who violates any provision of this title or the rules or regulations . . . by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, con-temporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a).

The plain language of the statute makes clear that "to state a claim under § 20A, a plaintiff must plead a predicate violation

of the '34 Act or its rules and regulations" that is independent of the 20A claim.  Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994).  Plaintiffs have failed to plead a primary violation of the Securities Exchange Act against any of the individual Cornerstone Defendants, Eli Oxenhorn or Irwin Lieber and have alleged no predicate violation against any of the individual Wheatley Defendants or any of the individual Sandler Defendants.  Accordingly, Count Four and Count Five of the Amended Complaint against each of the individual Defendants are DISMISSED.

F.   Punitive Damages

It is clear that there is no separate cause of action for punitive actions for pleading purposes under New York law.  See Lovebright Diamond Co. v. Spragins, 574 F. Supp. 76, 80 (S.D.N.Y. 1983) (citing Bader's Residence for Adults v. Telecom Equipment Corp., 90 A.D.2d 764 (2d Dep't 1982)).  Accordingly, Count Six of the Amended Complaint is DISMISSED.

IV. LEAVE TO REPLEAD

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a).  "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."

52

Cohen v. Citibank, 1997 WL 88378 at *2 (S.D.N.Y. 1997).  Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead.  See Protter v. Nathan's Famous Sys., Inc., 904 F.Supp. 101, 111 (E.D.N.Y. 1995) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

However, if an amendment would be futile, a court may deny leave to amend.  See Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  Id. (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

Plaintiffs filed the original Complaint in this matter on November 22, 2002, alleging securities fraud, common law fraud, detrimental reliance, breach of fiduciary duty, and violation of New York General Business Law § 352-c against all Defendants. Wheatley Defendants moved to dismiss claiming that Plaintiffs' securities fraud claims failed because they were barred by the applicable statute of limitations, and alternatively, that Plaintiffs' claims were defective pursuant to Rule 12(b)(6); Sandler Defendants also moved to dismiss pursuant to Rules 12(b)(6) and 9(b).  Plaintiffs filed an opposition to the motions

Sandler Defendants also moved to dismiss pursuant to Rules 12(b)(6) and 9(b). Plaintiffs filed an opposition to the motions to dismiss, as well as a cross-motion to amend the Complaint. On April 30, 2003, the Court granted the cross-motion to amend the Complaint. Plaintiffs filed the Amended Complaint and Defendants again moved to dismiss.

The Court finds that Plaintiffs' allegations of securities fraud, upon which their other claims rest, are fundamentally without merit. Allowing Plaintiffs a third bite at the apple would not change that. It would be futile for Plaintiffs to replead their securities fraud claim or any of their other claims. Accordingly, the Court DENIES Plaintiffs leave to replead their Amended Complaint.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED IN PART. Plaintiffs' Amended Complaint is DISMISSED with prejudice in its entirety. The Clerk of Court is directed to close the docket in this case.

SO ORDERED.

Dated:    New York, New York
          February 22 , 2007

          DEBORAH A. BATTS
          United States District Judge

54